UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Orbital Engineering, Inc., | File No. 25-CV-02121 (JMB/SGE) |
| Plaintiff, | |
| v. | **ORDER** |
| Short Elliott Hendrickson, Inc., Douglas M. Cabak, and Daniel Messner, | |
| Defendants. | |

John Rock and Kathryn A. Stephens, Rock Hutchinson, PLLP, Minneapolis, MN; and Alexis B. Thurston (*pro hac vice*) and Fridrickh V. Shrayber (*pro hac vice*), Dentons Cohen & Grigsby P.C., Pittsburgh, PA, for Plaintiff.

Ellen A. Brinkman and Killian J. Commers, Gordon Rees Scully Mansukhani LLP, Minneapolis, MN, for Defendants.

This matter is before the Court on Defendants Short Elliott Hendrickson, Inc.'s (SEH), Douglas Cabak's, and Daniel Messner's (together, Defendants) Motion for Partial Dismissal. (Doc. No. 16.) For the reasons explained below, the Court grants in part and denies in part Defendants' Motion and dismisses Count VII of Plaintiff Orbital Engineering, Inc.'s (Orbital) Complaint without prejudice.

## BACKGROUND

Orbital alleges that one of its former managers, Cabak, purloined some of Orbital's proprietary information and improperly recruited other Orbital employees when he left to start a new business group for SEH. (Doc. No. 1 [hereinafter, Compl.] ¶ 1.) One of the other Orbital employees that SEH and Cabak are alleged to have poached was Messner,

1

who worked with them to successfully "divert business" from an Orbital customer whom Messner had previously serviced. (*Id.* ¶¶ 1, 34.)

Orbital provides a range of engineering-related services to different industries. (*Id.* ¶¶ 11–12.) In order to compete in this "highly competitive" field, Orbital "devotes significant resources to train its employees to ensure that they acquire and maintain the knowledge and skills necessary to provide effective sales and service support to [Orbital's] customers" and "devotes significant time and money to develop long-term customer relationships and goodwill." (*Id.* ¶¶ 15–17.)

Both Cabak and Messner worked in Orbital's Electrical Distribution Services (EDS) division, servicing customers in the electric utility industry. (*Id.* ¶¶ 25, 33.) Orbital has invested "substantial time, resources, and money" into developing proprietary information and methods "to maintain its competitive position in the EDS space," including the following types of "trade secret information relating to its delivery of its EDS services":

> a) Orbital's models and methodology used in calculating project pricing and costs, including the various inputs that make up that calculation;
>
> b) Orbital's information and tools used to develop cost estimation for project tasks;
>
> c) Orbital's processes and timelines for completing projects, and the methods that it uses to specifically tailor these processes and timelines to particular customers; [and]
>
> d) Orbital's agreed billing rates by role for particular customers, which Orbital negotiated with such customers . . . .

(*Id.* ¶¶ 63–64.)

Through his work at Orbital, Cabak gained extensive information about "virtually every aspect" of Orbital's EDS work, including how to formulate and develop work proposals, forecast staffing needs and anticipated costs, and manage client relationships and business development. (*Id.* ¶¶ 37–38, 41.) Messner, who worked exclusively with a certain Orbital customer, gained "close working knowledge of Orbital's EDS business and its longstanding relationship with" that customer. (*Id.* ¶ 40.) Before Cabak left Orbital, the Complaint asserts that Cabak copied confidential information, began to recruit Orbital's employees and customers, and hid his intentions to join SEH. (*Id.* ¶¶ 42, 54–59.)

By hiring Cabak, SEH—a direct competitor of Orbital in the field of engineering, consulting, and project management services—was able to "jump-start" a "newly created" services group, "Distribution Design." (*Id.* ¶¶ 45–47.) In announcing that Cabak would lead this new group, SEH publicly touted his experience, expertise, and ability to "hit the ground running." (*Id.* ¶ 47.) After Cabak joined SEH, they started "exploiting Orbital's proprietary information and targeting Orbital's employees" and quickly succeeded in luring away Messner. (*Id.* ¶¶ 48–50.) The Complaint alleges that SEH's efforts paid off when, soon after Messner began working for SEH, the Orbital customer whom Messner had previously serviced informed Orbital that it was transitioning to SEH the work that Messner had performed while at Orbital, resulting in "hundreds of thousands of dollars in revenue" being "improperly diverted" from Orbital to SEH. (*Id.* ¶ 51; *see also id.* ¶ 60.)

Orbital was surprised by the loss of this customer's business, which it had expected to maintain and even grow, so Orbital began to investigate Cabak's activities. (*Id.* ¶¶ 52–53.) Orbital discovered that before resigning, Cabak had "downloaded and/or retained for

3

his personal use multiple documents containing Orbital's trade secret, proprietary and confidential information concerning the Company's business and its clients." (*Id.* ¶ 54.) Among these documents was a "'Master Tracker' spreadsheet" that "includes a list of multiple active Orbital projects, the budget and proposed costs associated with those projects, the anticipated expiration date for the projects," staffing-related budgeting for those projects, and other information that is "highly proprietary and not known outside of Orbital." (*Id.* ¶ 55.) Orbital also alleges that "[u]pon information and belief, Cabak retained numerous other documents and files containing Orbital's proprietary and confidential information concerning its business and its customers." (*Id.* ¶ 56.)[1]

Orbital asserts a variety of claims seeking monetary and injunctive relief based on this alleged misconduct, including misappropriation of trade secrets under federal and Minnesota statutes by Cabak and SEH (Counts I and II), breach of contract by Cabak (Count III) and Messner (Count IV), tortious interference with existing and prospective business relations by all Defendants (Count V), tortious interference with existing contractual relationships by SEH (Count VI), and unfair competition by all Defendants (Count VII). (*See id.* ¶ 2 & Counts I–VII.)

## DISCUSSION

Defendants move to dismiss all of the claims except the breach of contract claims against Cabak and Messner. (Doc. No. 16.) Because Orbital sufficiently alleges facts to plausibly state a claim for misappropriation of trade secrets, and Orbital's separate claims

---

[1] In its brief, Orbital alludes to discussions between counsel (*see* Doc. No. 24 at 8–9), but the Court cannot consider such extrinsic matters at this stage, *see* Fed. R. Civ. P. 12(d).

4

for tortious interference assert more than simply trade secrets misappropriation, the Court denies the motion as to Counts I, II, V, and VI. The Court grants the motion as to Count VII because it is displaced by the Minnesota Uniform Trade Secrets Act and, to the extent it is not displaced, Defendants fail to identify the tort at issue.

On a motion to dismiss under Rule 12(b)(6), courts consider all facts alleged in the complaint as a whole to be true and then determine whether the complaint states a "claim to relief that is plausible on its face." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *Warmington v. Bd. of Regents of Univ. of Minnesota*, 998 F.3d 789, 795–96 (8th Cir. 2021). A pleading has facial plausibility when its factual allegations "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. In this analysis, courts construe the allegations and draw inferences from them in the light most favorable to the plaintiff. *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 512 (8th Cir. 2018). However, courts will not give the plaintiff the benefit of unreasonable inferences, *Brown v. Medtronic, Inc.*, 628 F.3d 451, 461 (8th Cir. 2010), and are "not bound to accept as true a legal conclusion couched as a factual allegation," *Papasan v. Allain*, 478 U.S. 265, 286 (1986). All told, this standard "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the claim]." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

I.   **ORBITAL'S TRADE SECRET CLAIMS**

Defendants argue that Orbital's factual allegations cannot support its claims under either the federal or Minnesota trade secrets statutes for two reasons: Orbital does not

sufficiently allege that whatever information Defendants misappropriated were trade secrets, and Orbital does not allege that it took reasonable efforts to maintain the information's confidentiality.  (Doc. No. 18 at 6–11.)  The Court disagrees with this characterization of the allegations in the Complaint, which includes sufficient factual statements to plausibly plead a claim for misappropriation of trade secrets.

The federal Defend Trade Secrets Act and Minnesota Uniform Trade Secrets Act (MUTSA) impose similar definitions of "trade secret."  *Compare* 18 U.S.C. § 1839, *with* Minn. Stat. § 325C.01, subd. 5.  The federal act defines the term broadly ("all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible . . ."), subject to the caveats that the owner "has taken reasonable measures to keep such information secret" and "the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person."  18 U.S.C. § 1839(3).  Minnesota similarly defines trade secret and imposes nearly identical caveats.  *See* Minn. Stat. § 325C.01, subd. 5 (requiring that trade secret information derive "independent economic value" from "not being readily ascertainable by proper means" by others who would benefit from it and the owner took "reasonable" efforts to "maintain its secrecy").  Given their sensitivity, trade secrets need not be identified in detail or specifics to survive a motion to dismiss.  *Protégé Biomedical, LLC v. Z-Medica, LLC*, 394 F. Supp. 3d 924, 939 (D. Minn. 2019); *TE Connectivity Networks, Inc. v. All Sys. Broadband, Inc.*, No. CIV. 13-1356 ADM/FLN,

2013 WL 6827348, at *3–4 (D. Minn. Dec. 26, 2013).

Therefore, to state a claim for misappropriation of trade secrets, the factual allegations in a complaint must plausibly identify trade secret information, that has economic value, and which the plaintiff reasonably tried to keep confidential.

A. **Identification of Trade Secrets**

Defendants rely exclusively on *Hot Stuff Foods, LLC v. Dornbach*, 726 F. Supp. 2d 1038 (D. Minn. 2010), to argue by analogy that Orbital has not sufficiently identified the alleged trade secrets. However, Orbital has alleged significantly more facts than Hot Stuff Foods, making its overall allegations of trade secrets misappropriation plausible.

The complaint in *Hot Stuff Foods*, alleged that a former employee, prior to resigning and attempting to go into business on his own, downloaded and copied his employer's "confidential pricing and business planning information, . . . including a 'Rebate Calculator,' 'Confidential Expansion Plan[,]' and a sales forecast listing 'Targeted New Accounts.'" *Id.* at 1041. The complaint in *Hot Stuff Foods* failed to state a claim because it did not allege "facts showing that the information had independent economic value due to its secrecy, was not readily ascertainable by others and that Hot Stuff took efforts to maintain its secrecy," instead merely making "conclusory statements" mirroring the statutory requirements. *Id.* at 1044.

Contrary to the complaint in *Hot Stuff Foods*, the Complaint in this case includes factual statements concerning all elements of this claim. As recounted above, Orbital alleges a scheme by Cabak and SEH to take Cabak's knowledge of Orbital's confidential business information, including Orbital's methods and information for pricing, budgeting,

7

and billing relating to its delivery of EDS services, and launch a brand-new, competing business group at SEH using that information as a leg up. (*See supra*, at 1–4.) Orbital alleges several specific categories of allegedly misappropriated trade secrets. (Compl. ¶¶ 63–64.) As in *Hot Stuff Foods*, Orbital alleges that Cabak downloaded at least one specific type of document, the "Master Tracker." (Compl. ¶ 55.) Unlike in *Hot Stuff Foods*, *see* 726 F. Supp. 2d at 1044, though, Orbital provided more detail about the copied document and its value to the company. Orbital alleges that the tracker contained valuable proprietary information about multiple projects, including budgeting information that the Court may infer would help SEH formulate competitive bids for similar projects. (Compl. ¶ 55.) Moreover, Hot Stuff Foods also claimed that its former employee attempted to poach one of its customers but acknowledged that the customer refused to switch over. *See* 726 F. Supp. 2d at 1041, 1043–44. Here, in contrast, Orbital alleges that by hiring Cabak and Messner to jumpstart the new business group, Defendants successfully diverted a significant amount of business from one of Orbital's customers (Compl. ¶¶ 51, 60), supporting an inference that the confidential information Cabak and Messner allegedly took with them from Orbital was indeed valuable and could not be gleaned without hiring former Orbital employees.

Other courts have denied motions to dismiss trade secrets claims on similar facts. Indeed, in *Ahern Rentals, Inc. v. EquipmentShare.com, Inc.*, the Eighth Circuit reversed the dismissal of a claim under the Defend Trade Secrets Act, concluding that Ahern adequately alleged information qualifying as trade secrets where that company identified the information that was allegedly misappropriated by its competitor as "customer lists, rental

8

information, pricing information, and marketing strategies." 59 F.4th 948, 952, 955 (8th Cir. 2023). That type of "non-public information has economic value because [its owner] 'derives economic benefit' from its not being readily known or ascertainable." *Id.* at 955 (quoting *Conseco Fin. Servicing Corp. v. N. Am. Mortg. Co.*, 381 F.3d 811, 819 (8th Cir. 2004) (in which the Eighth Circuit found it was "clear" that a company derived economic value from its confidential customer files)). *See also, e.g.*, *Orbital Eng'g, Inc. v. DVG Team, Inc.*, No. 2:22-CV-185-JPK, 2023 WL 3160302, at *8–9 (N.D. Ind. Apr. 28, 2023) (finding very similar allegations by Orbital in another case were sufficient to plausibly allege misappropriation of trade secrets); *Stratasys, Inc. v. Krampitz*, No. 17-cv-5524 (DSD/HB), 2018 WL 2247265, at *3 (D. Minn. May 16, 2018) (finding alleged facts sufficient where plaintiff alleged that confidential information including "material pricing," "staffing and consulting rates," "proprietary spreadsheets and software developed for delivering consultancy projects," and "customer lists" were trade secrets); *Deluxe Fin. Servs., LLC v. Shaw*, No. 16-cv-3065 (JRT/HB), 2017 WL 3327570, at *3–4 (D. Minn. Aug. 3, 2017) (finding allegations sufficient where plaintiffs identified confidential sales information such as customer pricing, sales strategies, profitability, and account details as trade secrets).

    *Deluxe* is informative. 2017 WL 3327570, at *3–4. In that case, the former employee worked for Deluxe for many years and had access to "Confidential Sales Information," which included "customer pricing data, production costs, check unit volumes, profitability, sales analyses, sales strategies, deal structures, sales plans, 'key account' data, check program management techniques, and account details." *Id.* at *1.

9

Before leaving to work for a competitor the employee downloaded files that included Confidential Sales Information and, after he joined the new employer, that competitor won over one of Deluxe's customers by allegedly using the Confidential Sales Information. *Id.* at *2. The *Deluxe* court also credited Deluxe's "unequivocal[]" assertions that the Confidential Sales Information was "not publicly known," that Deluxe "invested significant time, effort, and expense over many years to develop and preserve the confidentiality of its Confidential Sales Information," and that such information "would be of significant value to Deluxe's competitors." *Id.* at *3. Orbital makes similar allegations. (*E.g.*, Compl. ¶¶ 16–17, 19–21, 51–55, 63–64.) The *Deluxe* court found that Deluxe had alleged sufficient facts to plausibly show that the Confidential Sales Information was a trade secret. *Id.* at *4. Orbital has likewise alleged sufficient facts to plausibly allege its trade secrets claims.

Thus, reading the Complaint as a whole, as the Court must, *Warmington*, 998 F.3d at 795–96, Orbital has alleged sufficient factual allegations to identify the allegedly misappropriated trade secrets.

B.   **Reasonable Efforts to Maintain Confidentiality**

Defendants also argue that Orbital has not sufficiently alleged what steps it took to maintain the confidentiality of its trade secrets. (Doc. No. 18 at 8–11.) The Court concludes, however, that the Complaint includes sufficient factual allegations that, if true, establish reasonable efforts or measures to maintain the secrecy of Orbital's trade secrets.

As noted above, a plaintiff must allege that it has taken "reasonable" efforts or measures to maintain the secrecy of its trade secrets. 18 U.S.C. § 1839(3); Minn. Stat.

10

§ 325C.01, subd. 5. A plaintiff need not have expressly identified a particular piece of information as confidential for it to qualify as a trade secret, if "under all the circumstances," employees know or have "reason to know" that the plaintiff "intends or expects the secrecy of the type of information comprising the trade secret to be maintained." Minn. Stat. § 325C.01, subd. 5. Reasonable efforts may consist of, for example, identifying documents with trade secret information, implementing policies about what information employees should keep confidential, sharing confidential information with employees on only a "need to know" basis, and requiring a company's employees to enter into employment agreements that include provisions about keeping company proprietary information confidential. *E.g.*, *Ahern Rentals*, 59 F.4th at 955 ("Ahern identifies several steps that it takes to keep this information secret. For example, it requires its employees to sign detailed non-disclosure, non-solicitation, and non-competition agreements."); *T&T Mgmt., Inc. v. Choice Hotels Int'l, Inc.*, No. CV 24-1504 (JRT/DTS), 2025 WL 643033, at *6 (D. Minn. Feb. 27, 2025) ("T&T sufficiently alleged that the customer lists constitute trade secrets and that it derived independent economic value from that secrecy. T&T kept the information confidential and only provided it to employees that needed to know that information."); *Protégé Biomedical*, 394 F. Supp. 3d at 939 ("Protégé has adequately alleged the existence of trade secrets . . . . Protégé has described its efforts to maintain the information's secrecy, including by identifying documents with trade secret information, creating contracts, and requiring its employees to enter employment agreements."); *Deluxe Fin. Servs.*, 2017 WL 3327570, at *4 (describing policies and training about preserving the confidentiality of company confidential

11

information); *TE Connectivity Networks*, 2013 WL 6827348, at *4 ("TE has identified confidentiality agreements, which in addition to the other alleged [sic] facts, suggest TE had trade secrets and made reasonable efforts to maintain those secrets.").

In this case, Orbital alleges that it limits access to its confidential information on a "need to know" basis, uses technological safeguards such as passwords and other systems to prevent "unauthorized access and use of Orbital's information," "requir[es] employees to sign confidentiality agreements," and "requir[es] that employees acknowledge their understanding of and their agreement with the confidentiality provisions in the Orbital employee handbook, which forbid the disclosure and misuse of the Company's confidential information."  (Compl. ¶ 21.)  Orbital alleges that Cabak and Messner signed confidentiality agreements that specifically identify confidential information—including some of the types of information at issue in this case, *e.g.*, "costs, profit and margin information, finances and financial projections, customers, clients, marketing, and current or future business plans . . ."—and obligate the employees to maintain the secrecy of such information.  (Compl. ¶ 27; Exs. B & D.)  Taking these allegations as true, Orbital has adequately alleged reasonable efforts to maintain the secrecy of the identified trade secret information.[2]

---

[2] Portions of Defendant's written submissions attempt to undermine Orbital's claim by alleging that Orbital shares some of the alleged confidential information with third parties. (Doc. No. 18 at 9–10.)  This argument, however, is misplaced given the standard on a motion to dismiss, and even assuming the Court could consider these contrary factual allegations, they only refer to one or two of the many types of trade secret information identified in the Complaint.  Such contrary allegations cannot support dismissal of the broader claim raised in the Complaint.

## II.   REMAINING ARGUMENTS

Defendants contend that Orbital's causes of action for tortious interference and unfair competition are displaced by MUTSA. (Doc. No. 18 at 11–15.) They also argue that a claim for "unfair competition" should be dismissed when the plaintiff does not identify the underlying tort or it is duplicative of other claims. (*Id.* at 15.) The Court disagrees with Defendants' argument concerning displacement, but agrees that as presented, Orbital's unfair competition claim does not rest on an independent tort.

First, the Court denies the motion with respect to the displacement argument. MUTSA "displace[s] conflicting tort, restitutionary, and other law of [Minnesota] providing civil remedies for misappropriation of a trade secret," but not "other civil remedies that are *not* based upon misappropriation of a trade secret . . . ." Minn. Stat. § 325C.07(a)–(b) (emphasis added). In other words, plaintiffs may maintain separate causes of action "to the extent that the causes of action have 'more' to their factual allegations than the mere misuse or misappropriation of trade secrets." *SL Montevideo Tech., Inc. v. Eaton Aerospace, LLC*, 292 F. Supp. 2d 1173, 1179–80 (D. Minn. 2003) (concluding that the tortious interference claim adding nothing "more" to the plaintiff's claim for misappropriation of trade secrets and quoting *Micro Display Sys., Inc. v. Axtel, Inc.,* 699 F. Supp. 202, 205 (D. Minn. 1988)).

Here, the allegations of tortious interference assert more than misappropriation of trade secrets. Contrary to the complaint in *SL Montevideo*, Orbital alleges that Defendants interfered with its employment contracts, customer contracts, and customer relationships by poaching employees with valuable customer experience and relationships—not just by

13

misappropriating confidential information.  (*See* Compl. ¶¶ 38–41, 46, 48, 98–99, 104-106.)  Such claims are not displaced by MUTSA.  *See TE Connectivity Networks*, 2013 WL 6827348, at *4–5; *Cardiac Pacemakers, Inc. v. Aspen II Holding Co.*, 413 F. Supp. 2d 1016, 1024 (D. Minn. 2006).

Second, the Court grants the motion with respect to Orbital's claim for unfair competition.  There is no standalone tort for "unfair competition" under Minnesota law.  *Rehab. Specialists, Inc. v. Koering*, 404 N.W.2d 301, 305 (Minn. Ct. App. 1987).  Orbital alleges that "Defendants have organized an improper scheme to jumpstart a Distribution Design practice at SEH, in part, by soliciting and hiring Orbital's employees as a means to improperly acquire Orbital's proprietary information, other employees, customers, and goodwill." (Compl. ¶ 111.)  To the extent the claim for unfair competition is premised on tortious interference with contracts (*see id.* (referring to "soliciting and hiring Orbital's employees" and "improperly acquir[ing]" Orbital's customers)), Count VII is duplicative of Counts V and VI.  To the extent it is another way of alleging that Defendants misappropriated Orbital's trade secrets (*see id.* (alleging improper acquisition of "Orbital's proprietary information")), this count is displaced by MUTSA.  Importantly, although Orbital argues that it may plead Count VII in the alternative, the factual allegations in the Complaint do not identify any tort other than contractual interference on which the claim for unfair competition could rest.  Thus, the Court dismisses Count VII.  *Zimmerman Grp., Inc. v. Fairmont Foods of Minnesota, Inc.*, 882 F. Supp. 892, 895 (D. Minn. 1994); *see also Goddard, Inc. v. Henry's Foods, Inc.*, 291 F. Supp. 2d 1021, 1034–35 (D. Minn. 2003)

14

(granting summary judgment on unfair competition claim where plaintiff did not identify any underlying tort).[3]

## ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT Defendants' Partial Motion to Dismiss (Doc. No. 16) is GRANTED in part and DENIED in part as follows:

1. Defendants' Partial Motion to Dismiss (Doc. No. 16) is DENIED as it relates to Counts I, II, V, and VI of Plaintiff's Complaint (Doc. No. 1).

2. Defendants' Partial Motion to Dismiss (Doc. No. 16) is GRANTED as it relates to Count VII of Plaintiff's Complaint (Doc. No. 1), and Count VII is DISMISSED WITHOUT PREJUDICE.

Dated: November 21, 2025                    /s/ *Jeffrey M. Bryan*
                                             Judge Jeffrey M. Bryan
                                             United States District Court

---

[3] Although the Court will dismiss this claim without prejudice, the Court does not reach Orbital's suggestion that they should be granted leave to amend their complaint (Doc. No. 24 at 19), as any such request must be made by motion. *See* D. Minn. L.R. 15.1.